

JAMES, VERNON & WEEKS, PA
*Helping people solve problems®*

LEANDER L. JAMES
CRAIG K. VERNON
1626 LINCOLN WAY
COEUR D'ALENE, ID  83814
Toll Free Telephone:  (888)-667-0683
Office Telephone: (208) 667-0683
ljames@jvwlaw.net
cvernon@jvwlaw.net

TOLMAGE, PESKIN, HARRIS, FALICK
STEPHAN H. PESKIN
MATTHEW C. LOMBARDI
20 VESEY STREET
NEW YORK, NY  10007
Toll Free Telephone:  (877) 298-3201
Office Telephone:  (212) 964-1390
peskin@tolmagepeskinlaw.com
lombardi@tomagepeskinlaw.com

March 15, 2024

Hon. Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East, Courtroom 13B-South
Brooklyn, New York 11201

    Re:  Sokolovsky v. Oorah, Inc. et al.
         Case No. 1:20-cv-04116

Dear Honorable Judge Pollak:

  I write on behalf of my client, Asher Lovy,[1] director of a non-profit, ZA'AKAH, seeking to quash in part Oorah Defendants' Subpoena Duces Tecum, Exh. 1. submitted herewith, pursuant to Fed. R. Civ. Pro. 45(d)(3), and for a protective order pursuant to Fed. R. Civ. Pro. 26(b).  I also write in response to Oorah Defendants' letter motion, Dkt. 123.

## MOTION TO QUASH

    I.    FACTS

  In 2016, Mr. Lovy assumed the directorship of an unincorporated organization called ZA'AKAH, a sponsored project of SNAP [Survivor's Network of Those Abused by Priests, a 501(3)(c)].[2]  Mr. Lovy contracts with SNAP to carry out that organization's charitable work with others under the name ZA'AKAH.   Mr. Lovy and his colleagues at ZA'AKAH raise awareness about child sexual abuse, participate in educational events and support survivors of child sexual abuse in the Orthodox Jewish community.  Mr. Lovy and his colleagues at ZA'AKAH help many sexual abuse survivors in New York State and in the Orthodox Jewish Community.  They know the names of abuse survivors, details of their abuse, details of their mental health treatment,

---

[1]  Plaintiff's Counsel jointly represents Mr. Lovy, ZA'AKAH and Plaintiff, as further explained herein.

[2]  SNAP is an Illinois nonprofit corporation qualified as exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code ("IRC") and classified as a public charity under IRC Sections 509(a)(1) and 170(b)(1)(A)(vi).

information about their legal representation, the identity of accused perpetrators, details about their alleged abuses and many more categories of confidential information.

Mr. Lovy is the recipient of confidential information in his work, including disclosures by child sexual abuse victims in the Jewish Orthodox community. He utilizes trade secrets, confidential research, development, and commercial information in his non-profit work. He networks with other individuals and organizations who assist sexual abuse victims. His communications with these individuals and organizations involve his trade secrets, confidential information of abuse victims and confidential information of the individuals and organizations with whom he networks.

Mr. Lovy has been the target of threats, retaliation and intimidation within the Orthodox Jewish community by known sexual abusers, accused sexual abusers, family members of abusers and accused abusers, and others in the Orthodox Jewish community protective of abusers and accused abusers. Similarly, his colleagues and the abuse survivors he works with have been the targets of threats, retaliation and intimidation. Some of the abuse survivors he helps have been threatened to recant their disclosure of abuse or face retaliatory consequences.

Plaintiff's Counsel has represented Mr. Lovy since 2019 in many aspects of his work, including legal research; investigation; defense of retaliation claims, threats and intimidation; protection of trade secrets and confidential information; and in other legal matters. As such, Plaintiff's Counsel and Mr. Lovy have exchanged hundreds of communications by email, correspondence and phone involving legal advice and representation, the vast majority involving confidential information of parties unrelated to the case at bar.

In his capacity with ZA'AKAH and SNAP, Mr. Lovy counseled Plaintiff as an abuse survivor. Defendants knew about ZA'KAH prior to May 24, 2023, and knew of Mr. Lovy's and ZA'AKAH's involvement with Plaintiff and Leah Forster at least as early as December 20, 2023, when witness Leah Forester testified to Mr. Lovy's and ZA'AKAH's involvement with Plaintiff.

On February 5, 2024,[3] Oorah Defendants served Mr. Asher Lovy, through his Counsel, Leander L. James, a "so-ordered" subpoena requiring Mr. Lovy to:

> Obtain any and all correspondence from Mr. Lovy and/or anyone representing his organization ZA'AKAH with either Plaintiff, Dorina Sokolovsky, Leah Forster, and/or plaintiff's counsels, JAMES VERNON & WEEKS, PA, or TOLMAGE PESKIN HARRIS & FALICK, including WhatsApp Messages, text messages, email communications, direct messages on all social medial platforms, call logs, and/or all other communications from 2012 to present.

Exhibit 2 submitted herewith (first subpoena).

---

[3] The subpoena was signed on January 29, 2024. Mr. Lovy's Counsel received it on February 5, 2024.

Mr. Lovy timely responded with the production of documents and data falling within the scope of said subpoena. These included two emails, two PDFs and 19 chats.[4] He has subsequently searched for responsive data/documents and produced what he can find with his technical abilities, resources and access to records. For example, see Exhibit 3 and Exhibit 4 submitted herewith. Mr. Lovy is not an e-discovery vendor, and he has scant financial resources as a non-profit worker.

On March 8, 2024, Oorah Defendants served Mr. Lovy, through his Counsel, with a second Subpoena duces tecum that substantially broadened the scope for data and documents, commanding him to produce the following data and documents at his deposition unilaterally scheduled on March 26, 2024:

1. A copy of Deponent's current driver's license.

2. Copies of your social media posts, including on behalf of Zaa'kah, regarding Plaintiff's claims made regarding the Oorah Defendants or Gittie Sheinkopf or this lawsuit;

3. Copies of written or electronic materials such as journals, correspondence, voice mails, voice notes and social media posts provided to you regarding Plaintiff's claims regarding the Oorah Defendants or Gittie Sheinkopf and this lawsuit;

4. Copies of your or Zaa'kah's communications including direct messages, texts, social media posts regarding Gittie Sheinkopf's fundraiser to defray her legal expenses;

5. Communications including correspondence, direct messages, videos, recordings, audio, text messages, podcasts, voice notes and social media posts with or about Plaintiff Leah Sokolovsky regarding the Oorah Defendants or Gittie Sheinkopf from 2011 to the present;

6. Communications including correspondence, direct messages, videos, recordings, audio, text messages, podcasts, voice notes and social media posts with or about Leah Forster regarding the Oorah Defendants or Gittie Sheinkopf from 2011 to the present;

7. Communications including correspondence, direct messages, videos, recordings, audio, text messages, podcasts, voice notes and social media posts with attorneys representing Plaintiff Leah Sokolovsky regarding the claims in this lawsuit, the Oorah Defendants or Gittie Sheinkopf from 2011 to the present;

8. Communications whether electronic, through social media or written with any campers and staff who attended camps operated by the Oorah Defendants from 2011 to present.

9. All communication and/or correspondence between you and third-parties, including but not limited, media outlets, or any other organizations, through letters, text messages, WhatsApp, emails, journal entries, direct social media messages, public or private posts on social media accounts, transcripts of telephone conversations, or any other means regarding the Plaintiff, the alleged abuse perpetrated by co-defendant Gittie Sheinkopf, or about the Oorah Defendants named in this lawsuit.

---

[4] Mr. Lovy additionally provided a privilege log listing documents withheld under the attorney-client privilege, largely relating to communications between him and his attorney about Oorah's subpoena, and including non-relevant communications.

Mr. Lovy does not have sufficient time, resources or technical skills to produce the large swath of data and documents under Oorah's second subpoena by March 26, 2024.

II.   LAW

Fed. R. Civ. Pro. 45(d)(3) provides in pertinent part:

> (3) *Quashing or Modifying a Subpoena.*
>
> (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
>
> (i) fails to allow a reasonable time to comply;
>
> . . .
>
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
>
> (iv) subjects a person to undue burden.
>
> (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
>
> (i) disclosing a trade secret or other confidential research, development, or commercial information; or
>
> (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
>
> (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
>
> (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
>
> (ii) ensures that the subpoenaed person will be reasonably compensated.

*Id*.

> Federal Rule of Civil Procedure 45 permits a party to serve a document subpoena on a non-party. See Fed. R. Civ. P. 45(a)(1)(A)(iii). A court must quash a subpoena "that: (i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." See Fed. R. Civ. P. 45(d)(3). A court may also issue a protective order prohibiting compliance with a subpoena that exceeds the scope of discoverable

information under Rule 26, i.e., "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); 26(c)(1); see Allstate Ins. Co. v. All Cty., LLC, No. 19 Civ. 7121 (WFK) (SJB), 2020 U.S. Dist. LEXIS 176297, 2020 WL 5668956, at *1 (E.D.N.Y. Sept. 22, 2020) (noting that a motion seeking to prevent compliance with a subpoena on relevance grounds is properly construed as a motion for a protective order—not a motion to quash—but acknowledging that "courts often use the language of quashing a subpoena when discussing relevance and proportionality").

*State Farm Mut. Auto. Ins. Co. v. Khait*, 21 Civ. 6690, 2023 U.S. Dist. LEXIS 171968, *5 (E.D.N.Y. 2023).

### III. ARGUMENT

Oorah Defendants' second subpoena on Mr. Lovy is within the context of Defendants' aggressive, overreaching discovery campaign that has been the subject of numerous motions and court orders. Mr. Lovy is a non-party with only a tangential relationship to this case; Ms. Sokolovsky sought assistance from him as an abuse survivor, and he counseled and assisted her for a short period. Yet, Oorah Defendants seek a large swath of documents and data that would require Mr. Lovy to produce confidential information of third parties (including of ZA'AKAH, SNAP and unrelated abuse survivors), trade secrets, confidential research, development, and commercial information in his non-profit work.

    1. Mr. Lovy is not ZA'AKAH or SNAP.

To be clear, Oorah Defendants' subpoena is directed to "ASHER LOVY," not ZA'AKAH or SNAP. Exh. 1. Yet, in their "Exhibit A," Defendants demand Mr. Lovy produce documents and data that are the property of ZA'AKAH, SNAP and others. For example, Defendants demand copies of social media posts, "including on behalf of Zaa'kah [sic]." Exhibit "A" to Exhibit 1, item 2. They demand "copies of your or Zaa'kah's communications including direct messages, texts, social media posts." Exhibit "A" to Exhibit 1, item 3.

Other individuals working under the name ZA'AKAH as contractors with SNAP work with survivors, communicate with survivors, correspond with them, create posts, respond to posts, etc. Oorah Defendants' subpoena would force Mr. Lovy to produce their work product.

Indeed, Mr. Lovy is not bound to produce ZA'AKAH's or SNAP's documents or data. Oorah Defendants do not seem to appreciate this distinction. By demanding Mr. Lovy produce documents, data, trade secrets and other information that belongs to ZA'AKAH or SNAP, Oorah Defendants are demanding production of confidential information and intellectual property of others. Were Mr. Lovy to comply, he would be subjected to potential liability to ZA'AKAH, SNAP, others working within these organizations and the individuals whose confidential information he disclosed.

If Defendants' want information from ZA'AKAH's or SNAP, they must issue subpoenas to the proper parties for that information.

  2. <u>Timing</u>.

  Oorah Defendants subpoena does not allow Mr. Lovy enough time to gather the large swath of documents and data requested. Fed. R. Civ. Pro. 45(d)(3)(A)(i). This time crunch is caused, in part, because of the late date of the subpoena duces tecum despite Defendants knowing of Mr. Lovy's involvement as early as December 2023. For example, it will likely take Mr. Lovy at least several weeks or more to search his data for the subpoenaed communications from every single person who contacted him or his organizations through their public social media, voice mail, and media posts (such as comments on media posts).

  Then, given his limited technical skills, financial resources and access to information, he will surely not be able to retrieve all the data and documents Defendants seek. For example, he has changed phones three times with two different carriers since Ms. Sokolovsky first contacted him. He does not have access to phone logs or WhatsApp messages.

  3. <u>Proportionality</u>.

  Defendants' subpoena violates the proportionality rule: "A court may also issue a protective order prohibiting compliance with a subpoena that exceeds the scope of discoverable information under Rule 26, i.e., 'nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.' Fed. R. Civ. P. 26(b)(1); 26(c)(1)." *State Farm Mut. Auto. Ins. Co. v. Khait*, supra. This Court has discretion to limit discovery that is disproportional:

> Rule 26 provides that the court: On motion or on its own . . . *must* limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.
> Rule 26(b)(2)(C)(iii) (emphasis added); *see, e.g., In re Subpoena Issued to Dennis Friedman*, 350 F.3d at 69 (noting that Rule 26(b)(2) permits a district court to limit discovery); *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 316 (S.D.N.Y. 2003) ("Rule 26(b)(2) imposes general limitations on the scope of discovery in the form of a 'proportionality test[.]'"); *Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 91 (D. Conn. 2012) ("Under Rule 26(b)(2)(C), courts impose a proportionality test to weigh the interests of the parties to determine whether discovery, even if relevant, should be allowed to proceed."); *Lineen v. Metcalf & Eddy, Inc.*, 1997 U.S. Dist. LEXIS 1767, 1997 WL 73763, at *2 (S.D.N.Y. Feb. 21, 1997) ("In determining [**12] the limits of discovery, [courts] must balance the plaintiff's need for the requested data against the burden imposed on the defendant.") (collecting cases)

*Raza v. City of New York*, 998 F. Supp. 2d 70, 76 (E.D.N.Y., 2013).

At this late stage of the case, Oorah's sweeping second subpoena is disproportional. Defendants seek the production of tangential material unlikely to lead to the discovery of admissible evidence or to advance resolution of the issues in this case. For example, Defendants require the production of comments/posts by third parties to Mr. Lovy's and ZA'AKAH's social media about Oorah, Plaintiff or the facts of this case. Random posts and comments by third parties are unlikely to advance the resolution of the issues in this case. While Oorah Defendants may want to know the identity of their detractors and of those who supported Plaintiff online for their own purposes, discovery of this information will not advance this case and may, on the contrary, trigger another wave of document and data discovery targeting these individuals for equally disproportionate and non-discoverable information.

The time, work, resources and energy necessary to locate these posts and the other data subpoenaed is disproportional to Oorah Defendant's needs. Oorah Defendants have already gathered thousands of documents and data, including thousands of pages of irrelevant data extracted by an e-discovery Vendor.[5] Apparently, Oorah Defendants have the resources to review thousands of pages of irrelevant data and to continue to demand more. However, Mr. Lovy does not. He is a non-profit worker with little economic resources and insufficient technical skills to engage in e-discovery data extraction. Nor are the documents and data produced by this non-profit worker likely to be of any importance to the resolution of the issues in this case. See *Raza*, supa.

    4.   Undo Burden.

Oorah Defendants' second subpoena subjects Mr. Lovy to undue burden. Fed. R. Civ. Pro. 45(d)(3)(A)(iv). Mr. Lovy has already searched his records and produced the documents requested in Oorah Defendants' first subpoena. He read that subpoena closely, and he fully complied with it. For a second time, Oorah Defendants are demanding Mr. Lovy research his data and material for sweeping categories of documents and data. Mr. Lovy does not have the time, skill, resources or technical ability to complete these searches.

Oorah Defendants demands are an undue burden on Mr. Lovy also to the extent these demands overlap with other discovery had. For example, Defendants have already obtained discovery of communications with Mr. Lovy through mining Plaintiff's data and subpoena duces tecums of other witnesses. Demanding production of the same data and documents from Mr. Lovy is redundant.

    5.   <u>Specific Categories of Oorah Defendants' demands</u>.

        a.   Social Media Posts

---

[5] Pursuant to this Court's discovery order, Plaintiff culled out 1075 documents as non-responsive that the e-discovery vendor listed on a "Non-Responsive Log," largely consisting of junk mail and advertisements with such subjects as: "Your Black Friday early access awaits," "50% off Black Friday Deals," "Early Access to a Special Disney Release?," "Grandparent's Day is just around the corner!," etc. Defendants, apparently convinced Plaintiff was nefariously hiding relevant documents, aggressively challenged Plaintiff's non-response designation. Rather than bickering with Defendants over the matter and creating yet another round of discovery motions, Plaintiff simply authorized the Vendor to give Defendants access to all 1075 non-responsive documents.

Oorah Defendants' second Subpoena requires Mr. Lovy to produce, "Copies of your social media posts, including on behalf of Zaa'kah [sic], regarding Plaintiff's claims made regarding the Oorah Defendants or Gittie Sheinkopf or this lawsuit."

First, this request improperly misconstrues "your" (Mr. Lovy's) as also meaning ZA'AKAH's. Again, Mr. Lovy is not ZA'AKAH.

Second, the requested social media posts would likely be public social media accessible to Defendants. They have equal access to these posts. Mr. Lovy should not be required to spend the time and resources searching public social media for posts that Defendants can themselves access.

Third, this is an extremely broad demand. Social media posts provided to by whom? By anyone? Must Mr. Lovy produce this data for every single person who has ever posted on his social media and ZA'AKAH's about Plaintiff's claims? Many people post social on Mr. Lovy's and ZA'AKAH's social media. To the extent these posts were private (if any), requiring him to comply with this demand would likely force him to search for and produce confidential information from numerous individuals, including abuse victims, and would necessarily require him to produce their identities. And for what purpose? How, for example, would it help resolve the issues in this case to know an abuse survivor posted that she experienced similar abuse at another camp? How, for example, would it help to resolve the issues in this case to know that an individual voiced support for Plaintiff or was critical of Oorah or Defendant Sheinkopf? Such data does not help resolve the issues.

Fourth, forcing Mr. Lovy to produce such posts and the identity of the individuals who posted would subject these individuals to potential intimidation, harassment and threats that he and the individuals he works with have endured in the past. For example, if an abuse survivor made a post critical of Oorah or Defendant Sheinkopf, the disclosure of their post and identity would subject them to potential intimidation or retaliation from Defendants. This concern is real, given the aggressive defense tactics mounted by both defendants (such as Defendant Sheinkopf's unfounded Motion for Sanctions, Dkt. 92) and Mr. Lovy's experience that abuse survivors who speak out in the Orthodox Jewish community are often subjected to threats and intimidation.

Fifth, disclosure of media posts stating the opinions and comments of individuals would likely lead to yet another round of aggressive discovery by Defendants to uncover the identities of those who posted with pseudonyms, the bases for posts critical of Oorah Defendants, and other such information that will not help resolve the issues in this case.

    b. "Copies of your or Zaa'kah's [sic] communications including direct messages, texts, social media posts regarding Gittie Sheinkopf's fundraiser to defray her legal expenses."

This request improperly misconstrues "your" (Mr. Lovy's) as also meaning ZA'AKAH's. It is overbroad and would similarly force Mr. Lovy to identify individuals, including abuse survivors, who were concerned about a fundraiser for an alleged abuser, Defendant Sheinkopf. What consequence is it to this case that individuals expressed concern that an alleged abuser was

fundraising for her defense?  None.  This lawsuit is about Ms. Sheinkopf abusing a child, not about Ms. Sheinkopf's fundraiser.

Forcing Mr. Lovy to produce this information would further expose him to liability for producing documents and data that are not his (see above, section 1).  It would also expose individuals who may then be harassed, threatened or ostracized from the Orthodox Jewish community.

c. "Communications including correspondence, direct messages, videos, recordings, audio, text messages, podcasts, voice notes and social media posts with or about Plaintiff Leah Sokolovsky regarding the Oorah Defendants or Gittie Sheinkopf from 2011 to the present;"

This sweeping demand is duplicative in part; Oorah Defendants have already obtained communications with Ms. Sokolovsky through their far-reaching e-discovery and extensive data search using a vendor.  As for the rest of the demand, it is overbroad, unduly burdensome and disproportionate.  Production of these items between Plaintiff and the non-profit who counseled her will have little to no bearing on the issues in this case; yet, they will require enormous time, expense and resources for Mr. Lovy to extract all the data demanded, if he can.

d. "Communications whether electronic, through social media or written with any campers and staff who attended camps operated by the Oorah Defendants from 2011 to present."

This demand is overbroad because it literally requires the production of communications from campers and staff who attended Oorah camps over a thirteen-year span of time whether or not these communication were related in any way to this case.  This demand is also, for all the reasons previously stated, disproportionate.

To the extent the communications may relate to this case, they may involve confidential communications by abuse survivors seeking help. Disclosure of this information and survivor identities would expose these individuals to potential intimidation, threats and ostracism from the Orthodox Jewish community

e. "All communication and/or correspondence between you and third-parties, including but not limited, media outlets, or any other organizations, through letters, text messages, WhatsApp, emails, journal entries, direct social media messages, public or private posts on social media accounts, transcripts of telephone conversations, or any other means regarding the Plaintiff, the alleged abuse perpetrated by co-defendant Gittie Sheinkopf, or about the Oorah Defendants named in this lawsuit." - Every single person I've ever spoken to about this lawsuit?

This demand is overbroad, unduly burdensome and disproportionate; it literally requires Mr. Lovy to produce every communication with every person he communicated with about Plaintiff, Gittie Sheinkopf and Oorah Defendants.  Mr. Lovy is not a party to this case.  He is not on trial.  His communications, such as his opinions about Oorah Defendants, are of little to no

consequence to the issues in this case. Nor does Mr. Lovy have the technical skills, ability, time, money or resources to engage in such a broad e-discovery search.

      6.   <u>Defendants should coordinate a reasonable date and time for Mr. Lovy's deposition</u>.

Oorah Defendants unilaterally scheduled Mr. Lovy's deposition for a date and time when his attorney is not available due to a previously scheduled deposition. Nor did Oorah Defendants provide Mr. Lovy the courtesy of coordinating the date and time with him. Defendants should be ordered to coordinate his deposition date and time available to Mr. Lovy and his counsel.

### **RESPONSE TO OORAH DEFENDANTS' LETTER MOTION REGARDING THEIR FIRST SUBPEONA, Dkt.123**

Based upon their "belief" that Mr. Lovy did not fully respond to their first subpoena, Exh. 2, Oorah Defendants accuse Mr. Lovy of noncompliance and seek a host of unwarranted and punitive remedies, including attorney's fees and costs. Defendants' belief is unjustified and wrong, and they are entitled to no remedies.

    I.   REPRESENTATION OF MR. LOVY AND ZA'AKAH.

Oorah Defendants' submission reeks of unjustified cynicism and innuendo. For example, Oorah Defendants state, "we received correspondence from Plaintiff's counsel, for the first time *purporting*[6] to represent Mr. Lovy and his organization ZA'AKAH. Dkt. 123, pg. 1. Plaintiff's Counsel does not "purport" to represent Mr. Lovy and ZA'AKAH. He does and has represented them for four years. He first met Mr. Lovy when he was asked by another non-profit organization to assist in drafting New York's Child Victims Act and to advise the New York Legislature about that Act, based upon his experience with similar legislation in other states. He encountered Mr. Lovy at events such as the John Jay College of Law educational panel on the CVA, where he was asked to be a panelist. Shortly thereafter, Plaintiff's counsel began representing Mr. Lovy and ZA'AKAH on a pro bono basis. There is nothing sinister or subversive for an attorney to provide pro bono assistance to a non-profit or a non-profit worker. Indeed New York Rule of Professional Conduct 6.1 provides in pertinent part:

> As part of the effort to ensure that New Yorkers of low-income and modest means have access to legal services, Rule 6.1 and Rule 6.5 of the Rules of Professional Conduct have been promulgated by the Appellate Divisions of the Supreme Court to encourage the performance of pro bono work by attorneys.

---

[6] "Purporting" is defined as: "appear or claim to be or do something, especially <u>falsely</u>." https://www.google.com/search?q=purporting+definition&rlz=1C1GIVA_enUS986US986&oq=purporting+d&gs_l crp=EgZjaHJvbWUqBwgAEAAYgAQyBwgAEAAYgAQyBggBEEUYOTIICAIQABgWGB4yDAgDEAAYChgP GBYYHjIKCAQQABgPGBYYHjIKCAUQABgPGBYYHjIKCAYQABgPGBYYHjIKCAcQABgPGBYYHjIKCA gQABgPGBYYHjIKCAkQABgPGBYYHqgCALACAA&sourceid=chrome&ie=UTF-8

> <u>Rule 6.1</u> strongly encourages attorneys to provide at least 50 hours of pro bono legal services each year and to support financially the work of organizations that provide such services.

*Id.*

## II. MR. LOVY'S COMPLIANCE WITH THE FIRST SUBPOENA

Oorah Defendants highlight that Mr. Lovy did not object to the first subpoena and complain at length that Mr. Lovy responded to the subpoena by producing documents through his attorney, who reviewed them for privilege, confidentiality and non-responsiveness. Dkt 123, pg. 2. Since Defendants' first subpoena was narrow, asking only for limited "communications," Mr. Lovy did not want to get into an argument with Defendants over it by objecting (which in hindsight was perhaps naïve, because Defendants seem bent on fighting over everything, including non-issues in the instant motion).

As for Mr. Lovy's attorney reviewing his production, there is nothing sinister about a client under subpoena producing documents through his attorney who reviews them for privilege, confidentiality and non-responsiveness. In fact, that is the proper procedure for a represented person; they should communicate through their attorney and not directly with the party issuing the subpoena. Oorah Defendant's Counsel would have Mr. Lovy communicate directly with her by producing the documents directly to her and not his attorney, in violation of New York Rule of Professional Conduct 4.2(a) regarding communications with represented persons.[7]

Further, and ironically, Mr. Lovy's attorney review caught the confidential name of an abuse survivor. He informed Oorah Defendant's about this and they agreed that the name should be redacted from the documents. Had Mr. Lovy produced the documents directly to Oorah Defendants, as they argue he should have, the name of this innocent, non-party abuse victim would have been disclosed, which could be very damaging to the non-party.

## III. MR. LOVY'S PRODUCTION OF A PRIVILEGE LOG

Oorah Defendants next complain they did not receive a privilege log until March 10, 2024. Dkt. 123, pg. 2. What's the beef? Lovy produced a privilege log identifying communications between him and his attorney about Oorah Defendant's subpoena. Defendants have it. In his log, Mr. Lovy even listed non-responsive communications with his attorney that were not at all relevant to this action, which is not required under Fed. R. Civ. Pro. 45.

Inexplicably, Oorah Defendants go on to complain the privilege log is incomplete when it contains all the necessary information. The privilege log provided precisely the information required by the federal and local rules, including the person asserting the privilege, nature of the

---

[7] In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law.

privilege, type of document, general subject matter, date of the document, author of the document, addresses of the document and other recipients. Dkt. 123, Exh. J. See also Local Civil Rule 26.2.

IV.   OORAH DEFENDANTS COMPLAINTS ABOUT SCREEN SHOTS

Oorah Defendants complain at length that Mr. Lovy produced screen shots. Mr. Lovy is not an e-discovery vendor. He provided the data and documents in a reasonable format consistent with his technical abilities. If Defendants want to ask about the dates of these "snippets" or want to see them firsthand, they can do so at his deposition.

Oorah Defendants again complain that Mr. Lovy produced the documents to his attorney who then produced them in their entirety to Defendants (except privileged documents and the name of a third party redacted as agreed to by Oorah Defendants). Without a basis in fact, Oorah Defendants imply Mr. Lovy or his counsel altered the documents. Such implication is improper. They did not.

V.   BASED ON MS. FORSTER'S TESTIMONY, OORAH DEFENDANTS ASSUME MR. LOVY IS HIDING DOCUMENTS

Oorah Defendants complain at length that there must be documents in Mr. Lovy's possession that he hasn't produced because the "recent testimony of Ms. Forster contradicted" his production. Dkt. 123, pg. 3. Mr. Lovy carefully read Defendants' first subpoena and produced what he could find in response thereto. Defendants accuse Mr. Lovy of defying the subpoena and other improper conduct. Such accusations are unfounded and unjustified. There are other reasonable explanations for the perceived "contradiction." Mr. Lovy has gone through three phones and two providers and was therefore unable to access his old WhatsApp messages. See Exh. 3. Defendants may have misunderstood Ms. Forster's testimony. Ms. Forester's testimony may be inaccurate, or the documents and data may have long since been deleted. The fact of the matter is that Mr. Lovy produced what he could find in response to the subpoena. There is no grand conspiracy on his part to hide documents. Oorah Defendants' refusal to accept that Mr. Lovy can find no more responsive documents is not a basis to punish Mr. Lovy.

VI.   REQUEST FOR UNWARRANTED AND PUNITIVE REMEDIES IN THE FORM OF AN AWARD OF ATTORNEY'S FEES AND COSTS

Oorah Defendants conclude by seeking unwarranted remedies. Dkt. 123, pg. 5. They demand an order for a privilege log where one has already been produced. *Id*. They request Mr. Lovy's "appearance" at deposition when Mr. Lovy has not refused to appear for a deposition. They seek additional time to supplement their discovery responses when they and all parties are under an ongoing duty to supplement discovery anyway. Defendants are fighting over non-issues.

There is no basis in fact or law to demand Mr. Lovy produce another privilege log, especially

where Defendants do not identify any deficiency in the log produced.[8]  There is no reason for the Court to order more time for Defendants to supplement their discovery because all parties are already under a duty to supplement discovery under the Rules of Civil Procedure.  There is no basis in law or fact to sanction Mr. Lovy with an award of attorney's fees and costs, nor have Oorah Defendant's cited any authority for the same.  If anyone should be awarded fees and costs, it should be Mr. Lovy under Fed. R. Civ. P. 11 for having to respond to a motion without a basis in fact or, to some degree, law.

## CONCLUSION

The Court should quash Oorah Defendants' subpoena in part by narrowing the scope of the subpoena and area of inquiry in deposition to only:  1) Mr. Lovy's communications with Plaintiff, Leah Forester and Oorah in his personal capacity (not as an agent for ZA'AKAH or SNAP); 2) his knowledge of potential evidence directly related to the claims and defenses in this case; 3) his education training, experience and background, including his background and experience working with abuse survivors in the Orthodox Jewish community, provided he is not forced to disclose any of the identities or experiences of abuse survivors other than Plaintiff.

In so ordering, the Court should order that Mr. Lovy is not required to produce documents, data or information that belongs to ZA'AKAH or SNAP or that was created or involves agents of ZA'AKAH or SNAP, including Mr. Lovy when acting as their agent or contractor.  Alternatively, if the Court orders him to produce the information of these others, the Court's order should include reasonable protection for Mr. Lovy so it is clear he is responding to a Court Order and not voluntarily giving up their information.[9]

Respectfully submitted,

JAMES, VERNON & WEEKS, P.A.
TOLMAGE, PESKIN, HARRIS, FALICK

/s/ Leander L. James

By: _____
Leander L. James

---

[8] Defendants state, "we believe the production and the putative privilege log are insufficient," then do not state any basis in fact for their belief.  Dkt. 123, page 2.  Later, in a footnote, Defendants note this Court ordered a party to revise their log to include "the author and recipient for each document withheld."  Yet, Mr. Lovy provided that information in his log.  See Dkt. 123, Exh. J.

[9] Yet, it is troubling and likely violative of these third-parties' rights for the Court to enter an order that Mr. Lovy produce their information without those parties having notice or an opportunity to be heard.