# EXHIBIT E

Page 239

1    Q.    Did you have any communications with your
2    attorneys while Leah Forster was there?
3    A.    Yes.
4    Q.    How many?
5    A.    Several.
6    Q.    Was she there for all of them?
7    A.    No.
8    Q.    Is there a time period you can narrow that
9    down to?
10   A.    When we broke up, she wasn't involved
11   anymore.
12   Q.    Up until the time you broke up, was she
13   involved?
14   A.    Yes.
15   Q.    Thank you.
16         The photograph that is attached, you gave
17   that to your attorneys or Leah Forster gave that to
18   your attorneys?
19   A.    Yes.
20   Q.    And the date on that photograph, it
21   indicates August 8, 2010.
22   A.    What's the question?
23   Q.    Is that the date that the photograph was
24   taken?
25   A.    It was in the summer if that's the date; I

Page 240

```
 1        think that that's correct.
 2            Q.    Okay.  If you could just look at this
 3        document that we've marked, if you could tell me
 4        anywhere it refers to alleged abuse from 2009.
 5            A.    Right here (indicating).
 6            Q.    Hold on, she's looking at something.
 7            A.    Over here it doesn't mention 2009.
 8            Q.    Let me see if I have a date stamp.
 9                  Is it your testimony that this photograph
10        we're looking at -- Troy, if you could pull it up to
11        see the photo that would be great -- that the abuse
12        had already happened?
13            A.    Yes.
14            Q.    And which hand are you indicating is
15        clenched?
16            A.    My right.
17            Q.    Do you think the way she's holding you is
18        inappropriate in this picture?
19            A.    Yes.  I don't think she should have her
20        hand on my waist.
21            Q.    Okay.  So let me see if we can pull up some
22        other photographs.
23                  While we're waiting for Troy to pull up
24        the other photographs, did Leah Forster communicate
25        with your counsel by email?
```

Page 241

1    A.    I believe so.
2    Q.    Were you on those emails?
3    A.    I think I was included.
4    Q.    Did Leah Forster attend any meeting with
5  your counsel?
6    A.    Sometimes.
7    Q.    Did Leah Forster attend any telephonic
8  communications with your counsel?
9    A.    Possibly.
10   Q.    Did Leah Forster provide any documentation
11 to your counsel?
12   A.    Yes.
13   Q.    Did Leah Forster draft or edit any of the
14 documents that were prepared by counsel?
15   A.    Yes -- wait, that were prepared by
16 counsel?
17   Q.    Yeah.  Did she review them and make
18 comments or edit them?
19   A.    She drafted PDFs to give to counsel, but
20 she didn't do anything after that.
21       MR. JAMES:  I'd object to the form of the
22     question because it's unclear what counsel you're
23     referring to.
24       MS. VARRIALE-BARKER:  Your prior counsel.
25       That's fair, let me clarify it.

Page 242

1          MR. JAMES:  Clarify because we've had
2    various attorneys involved there.
3          THE WITNESS:  So can you just ask the
4    question one more time?
5  BY MS. VARRIALE-BARKER:
6     Q.    Sure.  With your current counsel, did Leah
7  Forster review any drafts of documents?
8     A.    She composed them, that's all.
9     Q.    Did she attend any meetings with your
10 current counsel, whether by telephone or in person?
11    A.    She did sometimes by Zoom.
12    Q.    And the emails that you referred to
13 earlier, does that include current counsel, that she
14 communicated with them?
15    A.    Yes.
16    Q.    And you were on those emails as well from
17 time to time?
18    A.    Yeah, I think I was.
19    Q.    Okay.  Let's show you a few more photos.
20          So, in this action, Leah, are you claiming
21 that staff members and campers commonly engaged in
22 inappropriate touching and activities with each
23 other?
24    A.    Yes.
25    Q.    And would that include putting their arms